**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 North Main Avenue,
Tucson, AZ 85701,

Plaintiff,

v.

BRIAN NESVIK, in his official capacity as
Director of the U.S. Fish and Wildlife Service,
1849 C Street, NW
Washington, D.C. 20240, and

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior,
1849 C Street, NW
Washington, D.C. 20240,

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street N.W.
Washington, D.C. 20240.

Defendants.

Case No. 26-cv-3048

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiff, the Center for Biological Diversity ("the Center"), brings this case challenging the failure of the U.S. Fish and Wildlife Service ("Service") to designate critical habitat for the Rufa Red Knot, *Calidris canutus rufa*, ("Red Knot") in violation of the nondiscretionary, congressionally mandated deadlines set by the Endangered Species Act ("ESA"). The agency's failure to meet these deadlines delays crucial, lifesaving protections for this threatened species.

2. The Red Knot is an imperiled migratory shorebird whose up-to-19,000-mile round-trip migration is the stuff of legend.

3. The Service listed the Red Knot as threatened on December 11, 2014. The Service was required to designate critical habitat for the Red Knot concurrently with its listing or, if not then determinable, within one additional year. Despite this statutory obligation, the Service has failed to propose a rule designating critical habitat for the Red Knot.

4. The Service has abrogated its nondiscretionary duty to ensure that the Red Knot's critical habitat is timely protected, which is necessary to avoid further decline and an increased risk of extinction, in violation of the ESA.

5. The Center brings this lawsuit for declaratory and injunctive relief, seeking an Order declaring that the Service violated the ESA by failing to timely designate the critical habitat for the Red Knot and directing the Service to publish its overdue rule for critical habitat designation by a date certain.

## PARTIES

6. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit conservation organization that works through science, law, and policy to protect imperiled wildlife and their habitats. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices throughout the United States.

7. The Center has more than 1.8 million supporters and 101,000 active members throughout the country.

8. The Center brings this action on behalf of its organization, its staff, and its members who derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from the Red Knot and its habitat. The Center's interests in protecting and recovering the Red Knot are directly harmed by the failure of the Service to issue a timely rule protecting its critical habitat.

9. For example, Center member Susan Linder is a conservation wildlife biologist based in New Jersey who is committed to and focused on the conservation of Atlantic horseshoe crabs and the protection of the ecosystems that horseshoe crabs live in—ecosystems that include the Red Knots who eat horseshoe crab eggs. Ms. Linder first encountered Red Knots over a decade ago, when she came to the New Jersey side of Delaware Bay to engage in wildlife biology studies. She volunteered for a shorebird monitoring project, thinking it would be a one-day experience for her. Yet after holding individual Red Knots as part of the project's tasks of capturing, weighing, and banding shorebirds, she found herself returning to volunteer with the project every day, even though the drive from her house to the project site was over two hours each way. The experience deepened her aesthetic and emotional relationship with Red Knots in particular, and all birds in general. After holding her first Red Knot, Ms. Linder noticed that bird songs sounded different and more meaningful to her—as if she had established a new, magical connection and understanding of the winged creatures.

10. Ms. Linder encounters Red Knots every spring in Delaware Bay. This spring, as she was performing horseshoe crab egg density surveys, she stayed in a house on Reeds Beach, New Jersey. Her room faced the beach, and for many evenings in mid- to late-May, she watched thousands of Red Knots come to feast on horseshoe crab eggs just before sunset. To see that many at one time was a magical experience for her. Ms. Linder stayed until mid-June to undertake the egg density surveys, and because of her timing, she saw the last stragglers of the migrating Red Knots leave for their breeding grounds in the Arctic.

11. As she has done annually for more than a decade, Ms. Linder will return to the New Jersey beaches in Delaware Bay next spring (and every subsequent spring), and she expects to see the migrating Red Knots stop over to gorge on horseshoe crab eggs. Her awareness of the

relationship and direct correlation between horseshoe crab egg density and Red Knot migration makes her particular aesthetic interest in Red Knots especially sensitive. Her data collection annually shows her whether there is sufficient food for the Red Knots to finish their journey to the Arctic. If Ms. Linder finds that the birds are underweight by the time they need to continue on their migratory journeys, she fears that this means they will drop out of the sky to their deaths during the flight, others will fail to breed successfully in the Arctic, and fewer will return the following year. When she sees underweight Red Knots, or when she sees Red Knot population numbers decline, she is devastated.

12. Similarly, Center member Brett Hartl looks for, photographs, and records videos of wildlife—including Red Knots—both in the United States and around the world. Thus far, Mr. Hartl has observed over 875 species of mammals and 4,900 species of birds. He has a life goal of observing 1,000 species of mammals and at least one representative species from every family of birds in the world, of which there are approximately 250 families. To that end, Mr. Hartl goes birdwatching around the United States almost every week of the year, and more so during key migration periods in the spring and fall.

13. Mr. Hartl has taken numerous trips to observe Red Knots as far back as 2008 including along the coasts of Texas, North Carolina, Florida, New Jersey, Delaware and Maryland and he most recently observed Red Knots in North Carolina in May of 2026. Mr. Hartl receives deep aesthetic and recreational enjoyment from seeing and photographing Red Knots in the wild.

14. Mr. Hartl has concrete plans to return to Red Knot habitat and look for Red Knots including along the east coast of New Jersey this fall and again the spring of 2027 in Delaware when the species migrates north again. Whenever he is birdwatching in an area of the United

States, South America, or the Arctic when Red Knots may be migrating, nesting, or overwintering, he will seek out the opportunity to observe them.

15. Defendants' violations of the ESA's nondiscretionary mandatory deadlines have delayed protections for the Red Knot's critical habitat, harming the Center's members' interests in the shorebirds by failing to provide ESA protection for the places on which they depend for survival, which both increases their risk of extinction and decreases the likelihood that Ms. Linder, Mr. Hartl, and other Center members will encounter them in the wild. These injuries are actual, concrete injuries presently suffered by the Center's members, directly caused by Defendants' acts and omissions, and will continue unless the Court grants relief.

16. The relief that the Center seeks would redress these injuries by providing ESA protection for the Red Knot's critical habitat, thus promoting its conservation and recovery. The Center and its members have no other adequate remedy at law.

17. Defendant BRIAN NESVIK is the Director of the U.S. Fish and Wildlife Service and is charged with ensuring that agency decisions, including decisions about the Red Knot, comply with the ESA. Defendant Nesvik is sued in his official capacity.

18. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior and has the ultimate responsibility to administer and implement the provisions of the ESA, including decisions about the Red Knot. Defendant Burgum is sued in his official capacity.

19. Defendant U.S. FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior charged with implementing the ESA. The Secretary of the Interior has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b).

## JURISDICTION

20. This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) and (g), as well as 28 U.S.C. § 1331. This Court has authority to issue declaratory and injunctive

relief pursuant to the Endangered Species Act, 16 U.S.C. § 1540(g), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

21. Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) because this is the judicial district in which the violation is occurring. Venue is also proper pursuant to 28 U.S.C. § 1391(e)(1) because Defendants reside in this venue and a substantial part of the events or omissions giving rise to the claim occurred in this venue.

## STATUTORY FRAMEWORK

### The Endangered Species Act

22. The Endangered Species Act, 16 U.S.C. §§ 1531-1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

23. The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

24. A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

25. The ESA ensures substantive and procedural legal protections that apply to species once they are listed as endangered or threatened. Among these protections is the

requirement that the Service designate critical habitat for threatened and endangered species. *Id.* § 1533(a)(3).

26. Critical habitat is defined as: (i) the specific areas within the geographical area occupied by the species, at the time it is listed, on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protections; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed, upon a determination by the Secretary that such areas are essential for the conservation of the species. *Id.* § 1532(5)(A).

27. "Conservation" is in turn broadly defined to include "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3).

28. Under the ESA's plain language, "conservation" is thus "a much broader concept than mere survival." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 441 (5th Cir. 2001). The "clear" purpose of critical habitat designation "is for [the Service] to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,* 378 F.3d 1059, 1070 (9th Cir. 2004).

29. The ESA requires the Service to designate critical habitat for a species "concurrently with making a determination" that it is threatened or endangered—that is, at the time it is listed. *Id.* § 1533(a)(3)(A)(i). Specifically, the ESA provides:

> The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable—
> shall, *concurrently with making a determination* under paragraph (1) *that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat*; and may, from time-to-time thereafter as appropriate, revise such designation.
>
> *Id.* §1533(a)(3) (emphases added).

30. A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened. *Id.* § 1533(b)(6)(C).

31. This "concurrent" timeline requirement may be extended for no more than one year when critical habitat is not determinable at the time of listing. *Id.* § 1533(b)(6)(C)(ii) (noting that the Service, "with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) *by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation*, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.") (emphasis added).

32. Designation of critical habitat is accomplished through promulgation of a final rule after public notice and comment. *See id.* § 1533(b)(6).

33. The ESA sets forth the non-discretionary deadlines for this rulemaking process. The Service must publish a final rule within one year of publishing a proposed rule designating critical habitat for public notice and comment:

> *Within the one-year period beginning on the date on which general notice is published* in accordance with paragraph (5)(A)(i) regarding a proposed regulation, *the Secretary shall publish in the Federal Register*—
> ****
> (ii) subject to subparagraph (C), *if a designation of critical habitat is involved,* either—
> (I) *a final regulation to implement such designation*, or
> (II) notice that such one-year period is being extended under such subparagraph.

*Id.* § 1533(b)(6)(A) (emphases added.)

34. The failure to propose and finalize a rule designating critical habitat within the statutorily prescribed deadlines is a violation of the ESA.

35. The failure to timely designate critical habitat also deprives a species of other substantive protections it is afforded under the ESA. For example, ESA section 7(a)(2) requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification" of any listed species' critical habitat. *Id.* §1536(a)(2).

36. ESA section 9 prohibits, among other actions, "any person" from causing the "take" of any protected species without authorization from the Service. *Id.* §§ 1538(a)(1)(B), 1539; see also *id.* § 1532(19) (defining "take"). Other statutory provisions require the Service to "develop and implement" recovery plans for listed species, *id.* § 1533(f), authorize the Service to acquire land for the protection of listed species, *id.* § 1534, and authorize the Service to make federal funds available to states to assist in the conservation of endangered and threatened species, *id.* § 1535(d). All these provisions are integral to accomplishing the ESA's congressionally mandated purpose of conserving endangered and threatened species. *Id.* § 1531(b). They are informed and enhanced by the designation of critical habitat.

## **FACTUAL BACKGROUND**

### The Red Knot



*Photo credit: Gregory Breese/USFWS*
*Available at* https://www.fws.gov/media/red-knot-6

37. The Red Knot is a migratory shorebird known for its migrations with nonstop flights across great distances and named for its rusty plumage during spring migration.

38. Red Knots migrate from as far south as the Tierra del Fuego archipelago at the southern tip of South America all the way to their breeding grounds in the Arctic, stopping in the United States to rest and fuel up with food.

39. Red Knots depend on coastal stopover sites, like beaches in Delaware Bay and coastal Massachusetts, for survival. North American stopover locations allow Red Knots to rest and regain the energy needed to fuel the remainder of their migratory journeys.

40. The Red Knot is threatened with extinction by a variety of factors. These threats include human disturbance of their foraging and roosting, habitat destruction and modification from sea level rise and coastal development, depredation by native and non-native predators, and natural or man-made disasters like hurricanes and oil spills.

41. One of the most significant threats to the Red Knot is the overharvest of horseshoe crabs. Horseshoe crab eggs provide sustenance for Red Knots during their migration. The overharvesting of horseshoe crabs reduces the availability of food Red Knots need to make long-distance journeys.

42. In light of the threats facing the Red Knot, several conservation groups petitioned to list the species on July 28, 2005.

43. The Service listed the Red Knot as threatened on December 11, 2014. 79 Fed. Reg. 73706 (Dec. 11, 2014).

44. In the final listing, the Service did not designate critical habitat. *Id.*

45. The Service published a proposed rule to designate 649,066 acres of critical habitat for the Red Knot, across 120 units, in July 2021. 86 Fed. Reg. 37410 (Jul. 15, 2021).

46. Rather than finalize the designation, the Service revised its proposed rule and reopened public comment in April 2023. The revised proposed rule sought to designate 683,405 acres of critical habitat across 127 units. 88 Fed. Reg. 22530 (Apr. 13, 2023).

47. With the one-year extension from the final listing status determination, the Service's critical habitat designation for the Red Knot was required by December 11, 2015.

48. To date, the Service has failed to issue a final rule designating critical habitat for the Red Knot, and such designation is overdue. *See* 16 U.S.C. § 1533(b)(6)(A)(ii)(I).

49. The Center provided Defendants with 60 days' notice of its intent to sue for these ESA violations with a July 1, 2026, letter to Defendants. The letter was also delivered to the Southeast and Northeast Region Directors and the Ecological Services New Jersey Field Office Supervisor of the U.S. Fish and Wildlife Service.

## CLAIMS FOR RELIEF

50. Plaintiff re-alleges and incorporates all allegations set forth in the preceding paragraphs.

51. The ESA required Defendants to publish a critical habitat designation for the Red Knot at the time it was listed as threatened.

52. When Defendants did not designate critical habitat at the time of listing, *see* 79 Fed. Reg. at 73710 (noting in the final listing decision the future "development of a proposed critical habitat rule for the red knot"), they had no longer than one additional year to designate critical habitat for the Red Knot.

53. Despite listing the Red Knot as threatened in 2014, Defendants have failed to issue a final rule designating Red Knot critical habitat.

54. The deadlines to designate critical habitat for the Red Knot have passed.

55. Defendants have failed to perform their nondiscretionary duties to publish a timely final rule designating critical habitat for the Red Knot. 16 U.S.C. §§ 1533(a)(3)(A)(i), 1533(b)(6)(C)(ii).

56. By failing to designate critical habitat for the Red Knot, Defendants have abrogated their duties to ensure that the critical habitat of the Red Knot is timely protected to avoid an increased risk of its extinction, in violation of the ESA.

## REQUEST FOR RELIEF

60. WHEREFORE, the Center respectfully requests that the Court enter judgment providing the following relief:

i. Declare that Defendants violated the ESA by failing to timely designate the critical habitat for the Red Knot;

ii. Provide injunctive relief compelling Defendants to publish the critical habitat designation for the Red Knot in the Federal Register by a date certain;

iii. Retain continuing jurisdiction to review Defendants' compliance with all judgments and orders herein;

iv. Grant the Center its reasonable attorneys' fees and costs as provided by the ESA, 16 U.S.C. § 1540(g)(4); and

v. Provide such other relief as the Court deems just and proper.

Respectfully submitted this 1st day of September 2026.

*<u>/s/ Daniel H. Waltz</u>*
Daniel H. Waltz (D.D.C. Bar No. D00424)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005

Phone: (202) 386-6155
Email: dwaltz@biologicaldiversity.org

William J. Snape, III (D.C. Bar No. 455266)
AU WCL
4300 Nebraska Avenue NW
Washington, DC 20016
Email: wsnape@wcl.american.edu

*Attorneys for Plaintiff*